## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**HAROLD M. HOFFMAN**,

               Plaintiff,

    vs.

**LOTTERY.COM, INC. F/K/A TRIDENT ACQUISITIONS CORP., ANTHONY  DIMATTEO, MATTHEW CLEMENSON**, and **RYAN DICKINSON**,

               Defendants.

22 cv _____ (       )

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Harold M. Hoffman, *pro se* ("Plaintiff"), alleges as follows based upon personal knowledge as to his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, without limitation, independent investigation; review of the Defendants' public documents; conference calls and announcements made by Defendants; U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lottery.com, Inc. f/k/a Trident Acquisitions Corp. ("Lottery.com" or the "Company"); analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities action alleging claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Lottery.com Inc., headquartered in Spicewood, Texas, is a technology company  that operates a business-to-consumer (B2C) platform enabling players to remotely purchase legally sanctioned lottery games in the United States and internationally. The Company also provides affiliate marketing services under the LotteryLink brand, and delivers lottery data, such as winning numbers and results, to approximately 400 digital publishers and media organizations. Formerly  known as Trident Acquisitions Corp. ("TDAC"), the Company was formed as a Delaware corporation on March 17, 2016 and its securities traded on the Nasdaq Stock Market

under the symbols "TDAC," "TDACW," and "TDACU." TDAC completed its initial

public offering ("IPO") of 20,125,000 units on June 1, 2018.

3.      On October 29, 2021, pursuant to a Business Combination Agreement dated

February 21, 2021, TDAC consummated a business combination (the "Business

Combination")  with AutoLotto, Inc. ("AutoLotto"), which, since its founding in 2015,

conducted business as Lottery.com. Following the closing of the Business Combination,

the Company changed its name to Lottery.com, the business of AutoLot to became

Lottery.com's business, and the Company's shares began trading on the Nasdaq Stock

Market under the symbol "LTRY."

4.      On July 6, 2022, on a Form 8-K filed with the SEC, Lottery.com disclosed

that an  internal investigation, conducted by independent counsel, had uncovered

"instances of noncompliance with state and federal laws concerning the state in which

tickets are procured as w ell as order fulfillment." In addition, the investigation revealed

"issues pertaining to the Company's internal accounting controls." The July 6, 2022 8-K

further disclosed that, in light of the findings of the independent investigation, on June

30, 2022, the Board terminated the Company's President, Treasurer, and Chief Financial

Officer Ryan Dickinson ("Defendant Dickinson"), effective July 1,  2022.

5.      On this news, Lottery.com's shares fell $0.15, or more than 12%, from a closing

price of $1.22 per share on July 5, 2022 to a closing price of $1.07 per share on July 6, 2022,

on abnormally high volume.

6.      On July 15, 2022, in a Form 8 -K filed with the SEC after the markets closed, Lottery.com announced that Chief Revenue Officer ("CRO") Matthew Clemenson ("Defendant Clemenson") had resigned on July 11, 2022, effective immediately. Moreover, the Company  provided an update on the independent investigation previously disclosed on July 6, 2022. The Company reported that, after a review of its cash balances, its revenue recognition policies and procedures, and other internal accounting controls, Lottery.com had:

> preliminarily conclude[d] that it has overstated its available unrestricted cash balance by approximately $30 million and that, relatedly, in the prior fiscal year, it improperly recognized revenue in the same amount. The Company, in consultation with its outside advisors, is currently validating its preliminary conclusion, assessing any impact on previously issued financial reports, and has begun to institute appropriate remedial measures.

7.      On this news, shares of Lottery.com fell $0.14, or more than 14.5%, from a closing price of $0.96 per share on July 15, 2022 to a closing price of $0.82 per share on July 16, 2022, on abnormally high volume.

8.      The Company made a series of additional adverse disclosures before finally, on July 29, 2022, in another Form 8-K filed with the SEC, informing the market that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations," and that  it therefore intended to furlough certain employees effective July 29, 2022. Moreover, because Lottery.com's resources were not sufficient to fund its operations for a twelve month period, "there is substantial doubt about the Company's ability to continue as a going concern," and the Company  may be forced to

wind down its operations or pursue liquidation of the Company's assets.

9. In reaction to this news, shares of Lottery.com lost 64% of their value in a single trading day, falling $0.52 per share, from a closing price of $0.81 per share on July 28, 2022 to a close of $0.29 per share on July 29, 2022.

10. Commencing on or before November 15, 2021, Defendants made materially false or misleading statements and/or failed to disclose, *inter alia* , that: (I) the Company lacked adequate internal accounting controls; (ii) the Company lacked adequate internal controls over financial reporting, including but not limited to those pertaining to revenue recognition and the reporting of cash; (iii) the Company was not in compliance with state and federal laws governing the sale of lottery tickets; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The  claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa). This Court also has subject matter jurisdiction under 28 U.S.C. Section 1332(a) as the matter in controversy exceeds $75,000

and the citizenship of the parties is diverse.

14.    Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa©). Lottery.com's common shares trade on the Nasdaq Stock Market stock exchange, located in this Judicial District.

15.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff, a citizen of the State of New Jersey, purchased 20,000 shares of Lottery.com on November 22, 2021 at a cost of $149,397 and an average purchase price of $7.47 (hereinafter "Plaintiff's Purchase"). Plaintiff has suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.    Defendant Lottery.com is a Delaware corporation with principal executive offices located at 20808 State Highway 71 West, Unit B, Spicewood, Texas 78669. Lottery.com's  common stock trades in an efficient market on the NASDAQ under the trading symbol "LTRY".

18.    Defendant Lawrence Anthony "Tony" DiMatteo III has been Chief Executive Officer ("CEO") of Lottery.com since 2015 and Chairperson of the Board since October 2021.  Defendant DiMatteo has signed Lottery.com's Forms 10- K and 10-Q filed

with the SEC since prior to Plaintiff's Purchase.

19.     Defendant Ryan Dickinson served as the Company's President, Treasurer and Acting Chief Financial Officer ("CFO") from October 2021 until his termination effective July 1, 2022, and Chief Financial Officer from March 2022, until his termination effective July 1, 2022. Defendant Dickinson signed Lottery.com's Forms 10 -K and 10-Q filed with the SEC since prior to Plaintiff's Purchase.

20.     Defendant Matthew Clemenson served as CRO and director from March 2015 until his resignation on July 11, 2022.

21.     Defendants DiMatteo, Dickinson, and Clemenson are referred to herein collectively as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of Lottery.com's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Lottery.com's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Lottery.com, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false

statements and omissions pled herein.

## SUBSTANTIVE ALLEGATIONS

## Background

23.    Lottery.com is a leading provider of domestic and international lottery products and services that enable consumers and businesses to purchase purportedly legally sanctioned lottery tickets in the U.S. and abroad online through its proprietary platform, the B2C platform (the "Platform").  TDAC, its predecessor entity, completed its IPO of 20,125,000 units on June 1, 2018.

24.    The Company's revenue is derived from: (I) offering the B2C Platform via Lottery.com's app and websites to users located in certain U.S. and international jurisdictions; (ii) selling LotteryLink Credits to third-party master affiliate marketing partners that can be exchanged by them and by their sub- affiliates for LotteryLink promotion packages that include marketing collateral, prepaid advertising, development services, account management, and prepaid lottery games for use in promotions and marketing activities and promoting the B2C Platform; (iii) offering a proprietary business -to-business application programming interface ("API") of the Platform to enable Lottery.com's commercial partners to purchase lottery games from Lottery.com  and resell them ("B2B API"); and (iv) delivering global lottery data, such as winning numbers and results, and data sets of their proprietary, anonymized transaction data pursuant to multi-year contracts to commercial digital subscribers ("Data Service").

25.    On February 22, 2021, TDAC and AutoLotto announced that they had

entered into  the Business Combination Agreement that would result in AutoLotto (d/b/a

Lottery.com) becoming a publicly traded company. The press release announcing the

Business Combination stated, in pertinent part:

> NEW YORK and AUSTIN, Texas, Feb. 22, 2021 (GLOBE NEWSWIRE)
> • **Trident Acquisitions Corp.** (Nasdaq: TDACU, TDAC, TDACW)
> ("Trident") and AutoLotto, Inc. (" Lottery.com"), a leading online
> platform to play the lottery online or from a mobile device, have entered
> into a definitive agreement for a business combination that would result
> in Lottery.com becoming a publicly listed company.
>
> Founded in 2015, Lottery.com empowers users to play the lottery from
> their phone and on the go. It offers official state-sanctioned lottery
> games, like Powerball, Mega Millions and state games where
> permissible. Lottery.com is also the world's largest provider of lottery
> data to over 400 digital publishers, including hundreds of digital
> newspapers, television and news sites, and major digital publishers such
> as Google, Verizon/Yahoo and Amazon's Alexa devices.
>
> Lottery.com has been a pioneer in the lottery industry, working closely
> with state regulators to advance the industry into the digital age.
> Through its online platform, Lottery.com provides official lottery games
> and enhanced regulatory capabilities by developing innovative
> blockchain technology, while also capturing untapped  market share,
> including digitally native players.
>
> With the expected proceeds to be received by Lottery.com upon the
> closing of the transaction, Lottery.com would be well-positioned to
> accelerate its revenue growth  through further expansion in its existing
> markets and into new high-growth markets both domestically and
> internationally.
>
> **Lottery.com Investment Highlights**
>
>   • **Potential to Significantly Expand Global Market Share:**
>   Leveraging its successful playbook in the U.S., Lottery.com intends
>   to become a global marketplace for legally available lottery games to
>   consumers across the world. At $430 billion of global lottery sales
>   with only 4% online penetration, this is a large market opportunity

that is expected to shift to transact online during the next decade.

• **Innovative Ecommerce Platform Bringing an Outdated Industry into the Digital Age:** Lottery.com has developed a world- class safe and secure  mobile lottery platform and app leveraging blockchain technology to  maintain an accurate ledger that provides users th e ability to play official lottery games and other games of chance directly from their phone. Lottery.com has benefited from a customer acquisition cost of $4.01, with those users producing an average of $30.90 of gross revenue in their first year.

• **Favorable Macro Dynamics Driving Consumers Online:**   Betting and  gambling industries have begun successfully transitioning to online platforms as pandemic -related changes in consumer behavior have accelerated online and digital adoption. In addition, millennials are  increasingly participating in games of chance, including the lottery.

• **Easing Regulatory Environment Propelling Market Growth:** Many  states and international governments have been easing restrictions on lottery  games in an effort to increase ticket sales and revenue contribution in the form of tax as more and more gaming companies collaborate on lobbying efforts.

• **Poised for Expansion:** From 2016 to 2020, Lottery.com grew gross revenue at a compounded annual growth rate of 322%, and forecasts gross revenue equal to approximately $71 million in 2021, $280 million in 2022 and $571  million in 2023. Lottery.com is currently operating in 11 states across the U.S. and has plans to cover 34 states by the end of 2023. Lottery.com looks forward to announcing upcoming partnerships with significant room to expand into other countries, along with opportunities to grow deeper within  its current footprint.

• **Large and Growing Player Pool for Cross Selling Additional Games:** With over 7.5 million visitors in 2020, the Lottery.com platform is capable of distributing a range of wagering and games of chance across large and growing national and international markets**.**

"Lottery.com's innovative platform has already made significant progress bringing the lottery industry into the digital age and continuing to expand

its markets both domestically and internationally," said Vadim Komissarov, CEO of Trident. "With a track record of substantial growth and user base expansion in a relatively short period of time, we are confident that Lottery.com has the ability to cement its place as a leading online platform to both play the lottery and to introduce additional wagering and games of chance worldwide. We believe this transaction will allow Lottery.com to be on a path to reach its true growth potential, and we look forward  to working with the team as we introduce their compelling story to the public markets." Co-founder and CEO of Lottery.com, Tony DiMatteo, commented: "Lottery.com is innovating a legacy industry with ground-breaking technologies poised to capitalize on the large population of active internet and smartphone users in the U.S. and throughout the world. Over the past several months, we have made significant progress, launching our app in the Google Play Store and expanding domestically into Colorado and internationally through announced partnership plans in Turkey and Ukraine. We believe this transaction will further enhance our ability to grow into new markets as consumers are now, more than ever, engaging with digital and online platforms. The team at Trident shares our vision of growing  into a global marketplace for legally available lottery games, and other games of chance, to consumers across the world and we firmly believe this partnership will accelerate our growth."

***

**Transaction Terms**

The combined company will have an estimated post-business combination enterprise value of approximately $526 million.

The net proceeds raised from the business combination will be used to support Lottery.com's working capital and global platform expansion.

The proposed business combination contemplates that Lottery.com's stockholders will roll 100% of their equity into the combined company, with no minimum cash requirement to close the business combination.

Upon completion of the transaction, the combined company will be trademarked Lottery.com and its common stock is expected to remain listed on the Nasdaq Stock  Market under the new ticker symbol "LTRY."

10

26.     On February 23, 2021, in a Form 8K  filed with the SEC pursuant to Rule

425 under the Securities Act, TDAC disclosed additional details regarding the Business

Combination Agreement, including the following:

> On February 21, 2021, Trident Acquisitions Corp. ("TDAC") entered into a business combination agreement (the "Merger Agreement") with Trident Merger  Sub II Corp. ("Merger Sub") and AutoLotto, Inc. ("Lottery.com"). The transactions contemplated by the Merger Agreement are sometimes referred to herein as the "Merger" or the "Business Combination."

> Terms used herein as defined terms and not otherwise defined herein shall have the  meanings ascribed to them in the Merger Agreement.

> ***Acquisition of Lottery.com; Acquisition Consideration***

> Upon the closing (the "Closing") of the Business Combination, Merger Sub will merge with and into Lottery.com, with Lottery.com as the surviving company, continuing as a wholly owned subsidiary of TDAC, following the Merger and the  separate existence of Merger Sub shall cease. At the Closing, each share of Lottery.com Common Stock issued and outstanding as of immediately prior to the Closing shall be converted into the right to receive the Per Share Merger  Consideration. "Per Share Merger Consideration" means the quotient obtained by dividing (a) 40,000,000 shares of TDAC Common Stock by (b) the aggregate number of shares of Lottery.com Common Stock (including shares issued upon the conversion or exercise of Lottery.com convertible securities) issued and outstanding as of immediately prior to the Closing (the "Lottery.com Shares"). The Per Share Merger Consideration shall be reduced by the number of shares of TDAC Common Stock equal to the quotient of (i) the amount by which Net Indebtedness exceeds $10,000,000, as mutually agreed between TDAC and Lottery.com (each  acting reasonably), divided by (ii) 11.00. "Net Indebtedness" means the amount equal to Lottery.com's Indebtedness, less cash and cash equivalents. For the avoidance of doubt, Lottery.com's Indebtedness shall not include current liabilities or any intercompany Indebtedness between or among Lottery.com and any of its subsidiaries.

> The holders of the Lottery.com Shares (the "Sellers") will also be entitled to receive  up to 6,000,000 additional shares of TDAC Common Stock (the "Seller Earnout Shares") that may be issuable from time to time as set forth

11

below. The aggregate value of the consideration to be paid by TDAC in the Business Combination  (excluding the Seller Earnout Shares) is approximately $444 million (calculated as follows: 40,000,000 shares of TDAC Common Stock to be issued to the Sellers, multiplied by $11.00). Upon the Closing, TDAC will change its name to "LOTTERY.COM."

If, at any time on or prori to December 31, 2021, the daily volume-weighted average price of shares of TDAC Common Stock equals or exceeds $13.00 per share for 20 of any 30 consecutive trading days commencing after the Closing, each Seller shall receive its pro rata portion of 3,000,000 Seller Earnout Shares and Vadim Komissarov, Ilya Ponomarev and Marat Rosenberg (the "Founder Holders") shall receive an aggregate of 2,000,000 shares of TDAC Common Stock. If, at any time on or prior to December 31, 2022, the daily volume-weighted average price of shares of TDAC Common Stock equals or exceeds $16.00 per share for 20 of any 30 consecutive trading days commencing after the Closing, each Seller shall receive its pro rata portion of 3,000,000 Seller Earnout Shares and the Founder Holders shall receive an aggregate of 2,000,000 shares of TDAC Common Stock. The Seller Earnout Shares then earned and issuable shall be issued to the Sellers on a pro-rata basis based on the percentage of the Lottery.com Shares owned by them immediately prior to the Closing.

The parties agreed that immediately following the Closing, TDAC's board of directors will consist of five directors, four of which will be designated by Lottery.com and one of which will be designated by TDAC, such appointment by TDAC to be an independent director.

*Stockholder Approval*

Prior to the consummation of the Merger, the holders of a majority of TDAC's common stock attending a stockholder's meeting (at which there is a quorum) must approve the transactions contemplated by the Merger Agreement (the "Stockholder Approval"). In connection with obtaining the Stockholder Approval, TDAC must call a special meeting of its common stockholders and must prepare and file with  the SEC a Proxy Statement on Schedule 14A, which will be mailed to all  stockholders entitled to vote at the meeting.

27.     On October 29, 2021, the Company announced the completion of the

Business Combination, and that upon the closing, the combined entity was renamed

Lottery.com and its warrants and st ock would begin trading on the Nasdaq Stock

Market on November 1, 2021.  According to the press release:

> AUSTIN, Texas, October 29, 2021 -- (GLOBE NEWSWIRE) -- Lottery.com Inc.  (Nasdaq: LTRY, LTRYW) ("Lottery.com" or the "Company"), a leading technology company that is transforming how, where and when lottery is played announced today that it has completed its previously announced business combination with Trident Acquisitions Corp. ("Trident"). The transaction was approved at a special meeting of Trident's stockholders on October 28, 2021.  Additionally, Trident stockholders elected to retain 99.6% of Trident's outstanding stock, resulting in the Company receiving gross proceeds of over $63 million from the transaction.

> Upon the closing, the combined company was renamed Lottery.com Inc. and its common stock and warrants will begin trading on The Nasdaq Stock Market under the ticker symbols LTRY and LTRYW, respectively, on Monday, November 1,  2021.

> Tony DiMatteo, CEO of Lottery.com commented, "Today represents a momentous achievement for Lottery.com. I am grateful to all our stockholders for their continued support and the entire Lottery.com team for their dedication."

> He continued, "Since we entered our first state, our convenient online platform has resonated with consumers, which has driven our strong growth. As a public company with enhanced access to capital, we plan to continue building on this positive momentum by leveraging our low customer acquisition cost to further expand our customer base, broadening our product offerings, and executing on  strategic and synergistic acquisitions. We remain squarely focused on realizing the profitable growth opportunities before us and delivering long- term value to our stockholders."

28.     On November 1, 2021, Lottery.com's common shares and warrants began

trading on the Nasdaq under the ticker symbols "LTRY" and "LTRYW," respectively.

29.     On November 4, 2021, Lottery.com filed with the SEC a Form 8K-

announcing that the Business Combination had been consummated on October 29, 2021.

**Materially False and Misleading Statements Since November 15, 2021**

30.     On November 15, 2021, Lottery.com filed with the SEC a Form 8 -K that

announced that on November 10, 2021, the Company's Board of Directors had approved

the engagement of Aramino LLP as the Company's independent registered public

accounting firm to audit the Company's consolidated financial statements for the year

ended December 31, 2021, and the dismissal of Marcum LLP as the Company's audit

ing firm. With respect to Marcum LLP's audits of the financial statements of TDAC (prior

to the Business Combination), the Company reported that there were no issues or

concerns with any prior financial statement, for the years ended December 31, 2020 and

December 31, 2019. Specifically, the Company stated:

> The reports of Marcum on TDAC's financial statements as of and for the
> fiscal  years ended December 31, 2020 and December 31, 2019, did not
> contain an adverse opinion or a disclaimer of opinion, and were not
> qualified or modified as to uncertainty, audit scope or accounting
> principles.
>
> During TDAC's fiscal years ended December 31, 2020, December 31, 2019
> and during the subsequent interim period through November 10, 2021, the
> date of dismissal of Marcum, there were no disagreements between TDAC
> or the Company and Marcum on any matter of accounting principles or
> practices, financial statement disclosure, or auditing scope or procedure.
>
> During TDAC's fiscal year ending December 31, 2020, December 31,
> 2019 and  during the subsequent interim period through November 10,
> 2021, the date of dismissal of Marcum, there were no "reportable
> events" (as defined in Item 304(a)(1)(v) of Regulation S -K under the
> Securities Exchange Act of 1934, as amended) other than the material
> weakness in internal controls identified by management related to
> evaluating complex accounting issues relating to the warrants issued in

connect ion with TDAC's initial public offering, which resulted  in the restatement of TDAC's financial statements as set forth in TDAC's Form 10K/A for the year ended December 31, 2020, as filed with the SEC on June 28, 2021.

31.     Also on November 15, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ending September 30, 2021 (the "Q3 2021 10-Q"). In the Q3 2021 10-Q, Lottery.com stated that, "[i]n connection with the preparation of the Company's financial statements as of September30, 2021, management identified errors made in its historical financial statements where, at the closing of the Company's Initial Public Offering, the Company improperly valued its common stock subject to possible redemption." Accordingly, the Q3 2021 10-Q provided restated values for its common stock.

32.     In addition, the Q3 2021 10-Q referenced the fact that the Company had identified a material weakness and determined that its disclosure controls and procedures were not effective as of September 30, 2021, and thus had restated its financial statements on Form 10-K/A on June 28, 2021 (the "10- K/A"), in order to comply with a new SEC Staff Statement regarding the classification of warrants. Specifically, with respect to Lottery.com's Controls and Procedures, the Company stated:

> On April 12, 2021, the staff of the SEC issued a new Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs") (the "SEC Statement"). The SEC Statement addresses  certain accounting and reporting considerations related to warrants. In the SEC Statement, the staff of the SEC expressed its view that certain terms and conditions common to SPAC warrants may require the warrants to be classified as liabilities on the SPAC's balance sheet as opposed to equity. Based upon that evaluation and in light of the

SEC Statement, our certifying officers concluded that, *due solely to the material weakness identified that resulted in the restatement of the Company's financial statements to reclassify the Company's Private Warrants and UPO Warrants as described in the Explanatory Note to the 10K/A, our disclosure controls and procedures were not effective as of September 30, 2021.*

33.     Defendants went on to state that, other than the matters set forth in the 10

-K/A, there were no changes in internal control over financial reporting. Further,

Defendants represented that Lottery.com intended to "enhance [its] processes to identify

and appropriately apply applicable accounting requirements…." In full, the Company

stated:

### Changes in Internal Control Over Financial Reporting

*Other than what was described in the 10 -K/A, there were no changes in our internal control over financial reporting* (as such term is defined in Rules 13a 15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. In light of the restatement of our financial statements included in the 10-K/A, *we plan to enhance our processes to identify and appropriately apply applicable accounting requirements to better evaluate and understand the nuances of the complex accounting standards that apply to our financial statements*. Our plans at this time include providing enhanced access to accounting literature, research materials and documents and increased communication among our personnel and third-party professionals with whom we consult regarding complex accounting applications. The elements of our remediation plan can only be accomplished over time, and we can offer no assurance that these initiatives will ultimately have the intended effects.

34.     In connection with the Q3 2021 10 -Q, Defendants DiMatteo and Dickinson

each executed a certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

(the "SarbanesOxley Act"), and certified that:

1.      I have reviewed this quarterly report on Form 10-Q of Lottery.com Inc. for the quarterly period ended September 30, 2021;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all  material respects the financial condition, results of operations and cash flow s of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as  defined in Exchange Act Rules 13a -15(e) and 15d- 15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a -15(f) and 15d-15(f)) for the registrant and have:

        a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under my supervision, to ensure that material information relating to the registrant, is made known to us by others within those entities, particularly during the period in which this report is being prepared; and

        b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under my supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes  in accordance with generally accepted accounting principles; and

17

      c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report my conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

      d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial  reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

35.      Also pursuant to Section 906 of the Sarbanes-Oxley Act, Defendants DiMatteo and Dickinson certified that the Q3 2021 10-Q "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "[t]o my knowledge, the information contained in the Report fairly presents, in all

material respects, the financial condition and results of operations of the Company as of

and for the period covered by the Report."

36.     On March 31, 2022, the Company issued a press release, also filed as an

attachment to a Form 8-K filed with the SEC on that date, which reported Lottery.com's

"strong" financial  results for the fourth quarter ("Q4") and full-year 2021. Among the

information provided, the Company reported revenue of $21.5 million for Q 4 2021 (an

increase of $18.2 million over the prior year period) and revenue of $68.5 million for the

full year 2021 (an increase of $61 million over 2020). The Company also reported cash for

Q4 2021 of $62.6 million – an increase of $58.8  million over the prior year period.

37.     On April 1, 2022, the Company filed with the SEC its Annual Report on

Form 10K for the year ended December 31, 2021 (the "2021 10-K"). In addition to the

financial metrics reported in the press release the day before the 2021 10-K, the Company

stated that it had  identified a material weakness in internal control over financial

reporting as of year-end 2021 and 2020, but it described this material weakness as one

largely related to personnel and staffing –  specifically, it related to "the design and

operation of the procedures relating to the closing of financial statements ." Defendants

reassured investors that the Company had "commenced measures to remediate" such

material weakness. In particular, the Company stated the following:

In connection with the audits of our condensed consolidated

financial statements included in this Annual Report, *our management has*

*identified a material  weakness in internal control over financial*

*reporting as of December 31, 2021 and 2020 relating to deficiencies in the*

*design and operation of the procedures relating to the closing of our*

*financial statements*. These include: (i) our lack of a sufficient number of

personnel with an appropriate level of knowledge and  experience in

accounting for complex or non-routine transactions, (ii) the fact that our

policies and procedures with respect to the review, supervision and

monitoring of our accounting and reporting functions were either not

designed and in place or not operating effectively; (iii) the timely closing

of financial books at the quarter and fiscal year end, and (iv) incomplete

segregation of duties in certain types of  transactions and processes.

> *We have commenced measures to remediate the identified material*
> *weakness,*  including (i) adding personnel with sufficient accounting
> knowledge; (ii) adopting a more rigorous period -end review process for
> financial reporting; (iii) adopting improved period close processes and
> accounting processes, and (iv) clearly defining and documenting the
> segregation of duties for certain transactions and  processes. The
> implementation of our remediation is ongoing and will require validation
> and testing of the design and operating effectiveness of internal controls
> over a sustained period of financial reporting cycles. We may also
> conclude that additional measures may be required to remediate the
> material weakness in our internal control over financial reporting.

38.     The Company stated in the 2021 10 -K that other than the deficiencies

identified, "there was no change in our internal control over financial reporting."

39.     In the 2021 10- K, Defendants DiMatteo and Dickinson executed

certifications pursuant to Sections 302 and 906 of the Sarbanes -Oxley Act as set forth in paragraphs 34 – 35, *supra*.

40.     On May 16, 2022, the Company issued a press release, filed with the SEC on Form 8-K, in which it announced its "strong" financial results for the first quarter 2022, ended March 31, 2022 ("Q1 2022"). Among the highlights, Defendants reported that Lottery's Q1 2022  revenues were $21.2 million, an increase of $15.7 million over the prior year period. The Company further reported Q1 2022 cash of $50.8 million, up $32.5 million over the prior year period.

41.     Also on May 16, 2022, the Company filed its quarterly report for Q1 2022 on Form 10-Q (the "Q1 2022 10- Q"). In addition to reporting the financial metrics disclosed in the press release on the same day, the Q1 2022 10-Q  stated that management had "evaluated the effectiveness of our disclosure controls and procedures" and that:

> [b]ased on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, *as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to the material weakness in our internal control over financial reporting with respect to our financial statement close and reporting process*….

Critically, however, Defendants were careful to reassure investors that:

> Notwithstanding such material weakness in our internal control over financial reporting, our management concluded that *our condensed consolidated financial statements included in this Quarterly Report fairly present, in all material respects, our financial position*, results of operations and cash flows as of the dates  and for the periods presented in conformity with GAAP.

42.     With respect to the Business Combination, the 2021 10-K provided that:

On October 29, 2021, the Company and AutoLotto consummated the transact ions contemplated by the Merger Agreement. At the Closing, each share of common stock and preferred stock of AutoLotto that was issued and outstanding  immediately prior to the effective time of the Merger (other than excluded shares  as contemplated by the Merger Agreement) was cancelled and converted into the  right to receive approximately 3.0058 shares (the "Exchange Ratio") of Lottery.com. common stock.

The Merger closing was a triggering event for the Series B convertible notes, of which $63.8 million was converted into 3,248,526 shares of AutoLotto that were then converted into 9,764,511 shares of Lottery.com common stock using the Exchange Ratio.

At the Closing, each option to purchase AutoLotto's common stock, whether vested  or unvested, was assumed and converted into an option to purchase a number of shares of Lottery.com common stock in the manner set forth in the Merger Agreement.

The Company accounted for the Business Combination as a reverse recapitalization whereby AutoLotto was determined as t he accounting acquirer and TDAC as the accounting acquiree. Refer to Note 2, Summary of Significant Accounting Policies,  for further details. Accordingly, the Business Combination was treated as the equivalent of AutoLotto issuing stock for the net assets of TDAC, accompanied by  a recapitalization. The net assets of TDAC are stated at historical cost, with no goodwill or other intangible assets recorded.

The accompanying consolidated financial statements and related notes reflect the historical results of AutoLotto prior to the merger and do not include the historical results of TDAC prior to the consummation of Business combination.

Upon the closing of the transaction, AutoLotto received total gross proceeds of approximately $42,794,000, from TDAC's trust and operating accounts. Total transaction costs were approximately $9,460,000, which principally consisted of advisory, legal and other professional fees and were recorded in additional paid in capital. Cumulative debt repayments of approximately $11,068,000, inclusive of accrued but unpaid interest, were paid in conjunction with the close, which included approximately $5,475,000 repayment of notes payable to related parties, and

approximately $5,593,000 payment of accrued underwriter fees.

Pursuant to the terms of the Business Combination Agreement, the holders of issued  and outstanding shares of AutoLotto immediately prior to the Closing (the "Sellers") were entitled to receive up to 6,000,000 additional shares of Common  Stock (the "Seller Earnout Shares ") and Vadim Komissarov, Ilya Ponomarev and Marat Rosenberg (collectively the "TDAC Founders") were also entitled to receive up to 4,000,000 additional shares of Common Stock (the "TDAC Founder Earnout Shares" and, together with the Seller Earnout Shares, the "Earnout Shares"). One of the earnout criteria had not been met by the December 31, 2021 deadline thus no  earnout shares were granted specific to that criteria. As of December 31, 2021, 3,000,000 of the Seller Earnout Shares and 2,000,000 TDAC Founder Earnout Shares are still eligible Earnout Shares until December 31, 2022.

43.     Lastly, in the Q1 2022 10-Q, Defendants DiMatteo and Dickinson executed

certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act as set forth in

paragraphs 34 – 35, *supra*.


44.     The statements referenced in paragraphs 30 – 43, *supra*, were materially

false and misleading because Defendants made false and/or misleading statements, as

well as failed to disclose material adverse facts about the Company's business,

operations, and compliance  policies. Specifically, these statements misrepresented

and/or failed to disclose that: (i) the Company lacked adequate internal accounting

controls; (ii) the Company lacked adequate internal controls over financial reporting

pertaining to revenue recognition and the reporting of cash; (iii) the Company was not in

compliance with state and federal laws governing the sale of lottery tickets; and (iv) as a

result, the Company's public statements were materially false and misleading at all

relevant times.

**The Truth Emerges**

45.     Beginning on July 6, 2022, the true state of Lottery.com's finances and

operations was  gradually and incrementally revealed in a series of successive

disclosures made by the  Company. On July 6, 2022, in a Form 8 -K filed with the SEC,

Lottery.com disclosed that an internal investigation, conducted by independent counsel,

had uncovered "instances of ***noncompliance with state and federal laws*** concerning the

state in which tickets are procured as well as order fulfillment." In addition, the

investigation revealed "issues pertaining to the Company's ***internal accounting***

***controls***."[1] The July 6, 2022 8-K further disclosed that, in light of the findings of the

independent investigation, on June 30, 2022, the Board had terminated Defendant

Dickinson, the Company's CFO, President, and Treasurer, effective July 1, 2022.

46.     On this news, Lottery.com's shares fell $0.15, or more than 12%, from a closing

price of $1.22 per share on July 5, 2022 to a closing price of $1.07 per share on July 6, 2022,

on abnormally high volume.


47.     Next, on July 15, 2022, in a Form 8-K filed with the SEC after the markets

closed, Lottery.com announced that Defendant Clemenson, the Company's CRO, had

resigned on July 11, 2022, effective immediately. Moreover, the Company provided an

---

[1]

Unless otherwise indicated, all emphasis herein is added and does not appear in the
original text.

update on the independent investigation previously disclosed on July 6, 2022. The

Company reported that, after a review of its cash balances, its revenue recognition

policies and procedures, and other internal accounting controls, Lottery.com had:

> preliminarily conclude[d] that it has ***overstated its available***
> ***unrestricted cash balance by approximately $30 million*** and that,
> relatedly, in the prior fiscal year, it ***improperly recognized revenue*** in
> the same amount. The Company, in consultation with its outside
> advisors, is currently validating its preliminary conclusion, assessing
> any impact on previously issued financial reports, and has begun to
> institute appropriate remedial measures.

48.     On this news, shares of Lottery.com fell $0.14, or more than 14.5%, from a

closing price of $0.96 per share on July 15, 2022 to a closing price of $0.82 per share on

July 16, 2022, on abnormally high volume.

49.     Then, on July 22, 2022, Lottery.com filed another Form 8-K with the SEC in

which the Company disclosed that it had been advised by its independent accountant

that its audited financial statements for the fiscal year ended December 31, 2021 and

unaudited financial statements for the quarter ended March 31, 2022 should no longer be

relied upon. In addition, in the July 22, 2022 8-K, the Company reported that CEO and

co-founder Defendant DiMatteo was resigning, effective immediately. Specifically, the

Company's announcement provided that:

> **Item 4.02 Non -Reliance on Previously Issued Financial Statements**
> **or a Related Audit Report or Completed Interim Review.**
>
> (b) On July 20, 2022, Lottery.com Inc. (the "Company") was advised by
> Armanino LLP ("Armanino"), its registered independent public accountant
> for the fiscal year ended December 31, 2022, that the ***audited financial***
> ***statements for the year ended December 31, 2021, and the unaudited***

*financial statements for the quarter ended  March 31, 2022, should no longer be relied upon*. Armanino advised and determined subsequent to the audit and review of such financial statements, respectively, that a Company subsidiary entered into a line of credit in January 2022  that was not disclosed in the footnotes to the December 31, 2021 financial statements and was not recorded in the March 31, 2022 financial statements.

\*\*\*

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On July 21, 2022, Lawrence Anthony "Tony" DiMatteo III, the Chief Executive Officer (the "CEO") of the Company and a member of its Board of Directors (the "Board"), provided a notice of resignation as CEO of the Company, its wholly owned subsidiary, AutoLotto, Inc. ("AutoLotto"), and all of its other subsidi aries  and affiliates with the exception of LTRY WinTogether, Inc., with immediate effect. The Company accepted his resignation from such positions. Mr. DiMatteo served as an officer and director of AutoLotto since February 2015 and as CEO of the Company since the effectuation of the business combination in October 2021.

50.     On these disclosures, Lottery.com's shares fell $0.10, or more than 12%, over the next two trading days, from a closing price of $0.82 per share on July 22, 2022 to a closing price of $0.72 per share on July 26, 2022.

51.     Finally, on July 29, 2022, in another Form 8- K filed with the SEC, the Company disclosed that it did not have "sufficient financial resources to fund its operations or pay certain existing obligations," and that it therefore intended to furlough certain employees effective July  29, 2022. Moreover, because Lottery.com's resources were not sufficient to fund its operations for a twelve-month period, "there is substantial doubt about the Company's ability to continue as a going concern," and the Company may be

forced to wind down its operations or pursue liquidation of the Company's assets. In

full, the Company stated that:

> **Item 8.01 Other Events.**
>
> On July, 28, 2022, the Board of Directors of Lottery.com Inc. (the "Company") determined that ***the Company does not currently have sufficient financial resources to fund its operations or pay certain existing obligations, including its payroll and related obligations. Accordingly, the Company intends to furlough certain employees effective July 29, 2022***. As of July 29, 2022, the Company owed approximately $425,000 in outstanding payroll obligations. The Company's inability to pay this amount may result in employees terminating their relationship with the Company and/or pursuing legal remedies. Since the Company's business is dependent on the efforts and talents of its employees, particularly its developers and engineers, and the provision of ongoing services to customers by its employees, ***a material loss of its employee base may result in the inability of the Company to operate its technology, meet its obligations to customers, the loss of key customer relationships and revenue, and claims for breach of contractual obligations***. Additionally, ***the Company's capital resources are not sufficient to fund its operations for a twelve -month period and, therefore, there is substantial d oubt about the Company's ability to continue as a going concern***. If the Company is not able to secure additional capital resources or otherwise fund its operations, ***the Company will be forced to wind down some or all of its operations and pursue options for liquidating the Company's assets***, including equipment and intellectual property.

52.     In reaction to this news, shares of Lottery.com lost 64% of their value in a

single trading day, falling $0.52 per share, from a closing price of $0.81 per share on July

28, 2022 to a close of $0.29 per share on July 29, 2022.

## COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants)

53.     Plaintiff repeats and re-alleges each and every allegation contained above

as if fully set forth herein.

54.     This Count is asserted against all  Defendants and is based upon Section
10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by
the SEC.

55.     Defendants engaged in a plan, scheme, conspiracy and course of conduct,
pursuant to which they knowingly or recklessly engaged in acts, transactions,  practices
and courses of business which operated as a fraud and deceit upon Plaintiff; made
various untrue statements of material facts and omitted to state material facts necessary
in order to make the statements made, in light of the circumstances under which they
were made, not misleading; and employed devices, schemes and artifices to defraud in
connection with the purchase and sale of securities. Such scheme was intended to, and,
throughout the period of Plaintiff's acquisition and ownership of Lottery.com shares, did:
(i) deceive the investing public, including Plaintiff, as alleged herein; (ii) artificially inflate
and maintain the market price of Lottery.com securities; and (iii) cause Plaintiff to
purchase and hold Lottery.com shares/securities at artificially inflated prices. In
furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act
Defendants, and each of them, took the actions set forth herein.

56.     Pursuant to the above plan, scheme, conspiracy, and course of conduct,
each of the Defendants participated directly or indirectly in the preparation and/or
issuance of the quarterly and annual reports, SEC filings, press releases and other

statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Lottery.com securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Lottery.com's finances and business prospects.

57.     By virtue of their positions at Lottery.com, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

58.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Lottery.com, the Individual Defendants had knowledge of the details of Lottery.com's internal affairs.

59.     Defendants are liable bot h directly and indirectly for the wrongs

complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Lottery.com. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Lottery.com 's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Lottery.com's securities was artificially inflated prior to and throughout the period of Plaintiff's ownership of Lottery.com securities. In ignorance of the adverse facts concerning Lottery.com's business and financial condition which were concealed by Defendants, Plaintiff purchased Company securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and was damaged thereby.

60.     At all relevant times, Lottery.com securities were traded on an active and efficient market. Plaintiff, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Lottery.com securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff known the truth, he would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the

time of the purchases by Plaintiff, the true value of Lottery.com securities was

substantially lower than the prices paid by Plaintiff. The market price of Lottery.com

securities declined sharply upon public disclosure of the facts alleged herein to the injury

of Plaintiff.

61.     By reason of the conduct alleged herein, Defendants knowingly or

recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff

suffered damages in connection with his purchase of the Company's securities upon the

disclosure that the Company had been disseminating misrepresented financial

statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

63.     Plaintiff repeats and re-alleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

64.     At all relevant times, the Individual Defendants participated in the

operation  and management of Lottery.com , and conducted and participated, directly

and indirectly, in the conduct of Lottery.com's business affairs. Because of their senior

positions, the Individual Defendants knew the adverse  non-public information about

Lottery.com's misstatement of income and expenses and false financial statements.

65.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful  information with respect to Lottery.com's financial condition and results of operations, and correct to promptly any public statements issued by Lottery.com which had become materially false or misleading.

66.     Because of their positions of control and authority as senior officers, the Individual  Defendants were able to, and did, control the contents of the various reports, press releases and  public filings which  Lottery.com disseminated in the marketplace concerning  Lottery.com and its operations. At all relevant times, the Individual Defendants exercised their power and authority to cause Lottery.com to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Lottery.com within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Lottery.com securities.

67.     Each of the Individual Defendants, therefore, acted as a controlling person of Lottery.com. By reason of their senior management positions and/or being directors of Lottery.com, each of the Individual Defendants had the power to direct the actions of, and  exercised the same to cause, Lottery.com to engage in the unlawful acts and conduct complained  of herein. Each of the Individual Defendants exercised control over the

general operations of Lottery.com and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains and sustained injury.

68.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Lottery.com.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Requiring Defendants to pay damages sustained by Plaintiff by reason of the acts and transactions alleged herein;

B.     Awarding Plaintiff prejudgment and post-judgment interest, as well as his reasonable fees and other costs; and

C.     Awarding such other and further relief as this Court may deem just and proper.

### <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: December 21, 2022

Respectfully submitted,

**/s/ Harold M. Hoffman**
**HAROLD M. HOFFMAN, ESQ.**
**PRO SE**
240 Grand Avenue
Englewood, NJ 07631
(201) 569-0086
Email: hoffman.esq@verizon.net